505 F.Supp. 955 (1981)
VULCAN SOCIETY OF WESTCHESTER COUNTY, INC.; Hubert M. Robinson; Shearin O. Higgs; Clarence W. High III; Joseph Miles; James Garland; Buel McQuay; Henry Cleveland; Robert P. Gray III; Michael B. Smith; Ronald O. Archer; Larry M. Moyer; and Paul D. McQuay, Plaintiffs,
v.
FIRE DEPARTMENT OF the CITY OF WHITE PLAINS; et al.
Angelo Martinelli, et al.
and
Professional Fire Fighters Association, Inc., et al., Intervenor-Defendants.
UNITED STATES of America, Plaintiff,
v.
NEW YORK STATE DEPARTMENT OF CIVIL SERVICE; et al.
City of New Rochelle; Leonard C. Paduano et al.
and
Professional Fire Fighters Association, Inc., et al., Intervenor-Defendants.
Nos. 78 Civ. 911, 80 Civ. 0336 (ADS).
United States District Court, S. D. New York.
January 15, 1981.
*956 Teitelbaum & Hiller, New York City, for Vulcan Soc. of Westchester County, Inc., et al.; Richard Hiller and Herbert Teitelbaum, New York City, of counsel.
John S. Martin, Jr., U. S. Atty., S. D. New York, New York City, for United States of America; Nancy E. Friedman, Peter R. Paden, Kent T. Stauffer, Dennison Young, Jr., Asst. U. S. Attys., New York City, of counsel.
Arthur J. Doran, Jr., Acting Corp. Counsel for the City of Yonkers, Yonkers, N. Y., for Yonkers defendants; Robert Villani, Asst. Corp. Counsel, Yonkers, N. Y., of counsel.
*957 Epstein, Becker, Borsody & Green, for Yonkers defendants; Robert P. Borsody, Ronald M. Green, Susan Schenkel Savitt, Richard Lane Steer, Elliot J. Groffman, New York City, of counsel.
McGovern, Connelly & Davidson, New Rochelle, for New Rochelle defendants; Frank H. Connelly, Jr. and John A. Vasile, New Rochelle, of counsel.
Rains & Pogrebin, Mineola, N. Y., for White Plains and Mount Vernon defendants; Bertrand B. Pogrebin, Bruce R. Millman, Paul J. Schreiber, Mineola, N. Y., of counsel.
Robert Abrams, Atty. Gen. of the State of New York, for State defendants; Patricia Armstrong, Asst. Atty. Gen., New York City, of counsel.
Belson, Connolly & Belson, New York City, for intervenor-defendants; John J. Connolly and Nicholas R. Santangelo, New York City, of counsel.
SOFAER, District Judge:
Most of the parties in these consolidated employment discrimination cases have agreed to consent judgments, which they have submitted to the Court for approval. All of the proposed judgments are designed to enhance the prospect of equal employment opportunities for Blacks, Hispanics, and women in the fire departments of New Rochelle, Mount Vernon, and White Plains. Each city has agreed to a different settlement plan. One of these proposed judgments, that of New Rochelle, is unopposed. The two others, those of Mount Vernon and White Plains, are attacked by the intervenor unions as illegal and contrary to the public interest. For the reasons stated below, all three settlements are approved.
This litigation commenced in October 1975, when the Vulcan Society and several individual plaintiffs filed charges with the Equal Employment Opportunity Commission (EEOC) alleging discrimination against Blacks, Hispanics, and women in the employment practices of the fire departments in four cities of Westchester County. On February 11, 1975, the EEOC issued a certificate of probable cause to believe that violations of law existed. The Vulcan Society and others filed suit in this Court on March 1, 1978, against defendants from the four cities and the New York State Department of Civil Service, alleging discrimination against Blacks.
Motions to amend the complaint and to certify a class in the Vulcan suit were granted in part and denied in part in April 1979. See Vulcan Society of Westchester County v. Fire Department of White Plains, 82 F.R.D. 379 (S.D.N.Y.1979) (Sweet, J.). Discovery then commenced on the merits, and several motions relating to preliminary relief were decided. The Court has limited the hiring and promotion of firemen by the cities involved in this litigation, although many appointments and some promotions have been made by consent or with Court approval. On January 17, 1980, the federal government filed suit against the same defendants, alleging discrimination against Blacks, Hispanics, and women. The cases were ordered consolidated on April 22, 1980.
Throughout early 1980, the parties engaged in settlement negotiations even as they prepared for trial. In the Spring, the plaintiffs in both suits and the defendants from three of the cities announced that they had reached agreement on virtually all issues. The proposed consent judgments originally submitted by the plaintiffs and the three cities were similar. Subsequent events, however, have led the parties to revise the proposed judgments, so that each now differs materially from the others. A review of these judgments and their background is the first order of business.

I. The Proposed Settlements
In each of the proposed consent judgments, the defendants specifically deny any unlawful discrimination. All agree, however, to be enjoined and to refrain from considering race, national origin, or sex in making appointments to any position in the respective fire departments. The cities also undertake to recruit and train minorities and women, to eliminate height and reach requirements, and to implement a variety *958 of other changes as to which no objection has been raised.

A. The Original Consent Judgments

The controversial provisions in the proposed settlements are those aimed at increasing the proportion of minorities and women on the cities' firefighting forces. At the time these actions were commenced, the three cities had proportionately far fewer minorities on their forces than were available for employment in those cities and in Westchester County generally. The uncontroverted evidence illustrates the low representation of minorities in the fire forces involved. In 1970, minorities made up 3.9% of the fire department in New Rochelle, a city with a 16.1% minority population; in Mount Vernon, the respective figures were 3.1% and 36%; and in White Plains, 3.4% and 15.4%. Plaintiffs' Joint Memorandum of Law, June 17, 1980, Table IV. In addition, none of the three departments has a single minority officer, and none has ever hired a woman in any capacity.
To overcome these disparities in representation, the cities agreed in the original consent judgments to "undertake in good faith to hire firefighters so as to achieve the goal of a firefighter force in each City which reflects no less than the proportion of Blacks and Hispanics between the ages of eighteen (18) and forty-four (44) in the civil labor force ..." of each city. ¶ VI(A).[1] Women were to be hired, if possible, until they constituted at least 10% of each city's force. All of these were to be promoted, moreover, so that the officer ranks would reflect the proportion of the force represented by each group.
Because this hiring goal was not a "quota," it guaranteed very little. The original settlement agreements therefore also sought to attack the reasons why a disproportionately large percentage of the cities' firefighting forces was white. Plaintiffs attributed the lack of minorities on the cities' firefighting forces in large part to the written firefighter exam, prepared and administered by the New York State Department of Civil Service. Evidence has been presented that the written exam has a discriminatory impact.[2] Furthermore, plaintiffs asserted that the practice of giving the written exam greater weight than the physical agility test had a discriminatory effect. Recruitment procedures, plaintiffs concluded, would have to be modified to enhance the prospects of increased minority interest in firefighting jobs. Finally, plaintiffs were concerned with the impact on minorities of certain requirements or disqualifications, such as the disqualification for prior convictions or drug abuse, and the requirement of a high school diploma or its equivalent.
The original consent agreements dealt with these matters by revising in fundamental ways the process for selecting firefighters. First, New York State would revise and validate the written exams for entry and promotion. This, the parties agree, would first require, as a long term remedy, a job analysis for each position for which a written test was to be administered, and a performance rating for those jobs. Similar analyses have been conducted for other cities. See Hearing Transcript ["Tr"] at 194 (Dunnette study for United States Civil Service Commission). The job analyses were to be completed for all positions *959 within eighteen months; the State would then promulgate uniform job descriptions. Task performance rating surveys were to be completed within the same period. If the State failed to comply with these procedures, or if any test devised was found to have an adverse impact, the parties were to attempt to resolve the problem, failing which the plaintiffs could seek appropriate relief from the Court. ¶ IV.
The parties devised a formula to avoid adverse impact from the testing procedures to be used until either a validated examination could be designed or the hiring goals were met. A written test could be given, but if the statewide success rate for minorities on a particular question was less than 80% of the success rate for non-minorities, then that question would be excluded in scoring the test. Furthermore, the test would change from a "ranking" exam to a "qualifying" device; anyone who obtained a passing grade (70%) would be entitled to take the physical agility test. Finally, if minorities passed the written test at an overall rate of less than 80% of the passing rate for non-minorities, then the parties would negotiate to remedy the adverse impact, with resort to the Court available if negotiations were unsuccessful. ¶ II(B)(1). (The 80% requirement for test questions and for the test passing rate are hereafter referred to as the " 4/5 ths Rule.")
The original consent judgments retained the physical agility test, which the parties conceded was job-related and which they represented has no adverse impact upon minorities. Rather than merely retaining this test, however, the parties agreed that it should become the sole basis for ranking applicants, as compared to its past use as a qualifying test. Plaintiffs agreed, however, that the test could be changed by defendants to minimize any unlawful discriminatory impact it might have, presumably upon non-minorities, or to correct other problems that could impair the test's validity or reliability. ¶ II(B)(2).
A further, significant revision in the selection process was the proposed consent judgments' provision allowing persons with prior convictions or a history of drug abuse to apply for positions as firefighters or officers. If either of these factors was made a basis for rejecting an applicant, the department had to so indicate in writing, and the applicant would have a right to be heard. The defendants agreed to consider applicants individually before rejecting them on these grounds, and to weigh the factors listed in section 753 of the New York Correction Law, which applies by its terms only to applicants for public employment who have prior convictions, not to those merely with histories of drug abuse. ¶ II(C). The parties also agreed to many special recruitment provisions to increase the number and quality of minority and female applicants for firefighter positions. ¶ X.
Promotions to Fire Lieutenant and Fire Captain would continue to be based on written exams prepared by New York State. The test would provide ranked results, but the passing score would be 70%, and each question and the exam as a whole would be subject to the 4/5 ths Rule. Furthermore, the period of qualifying experience for promotion to lieutenant was reduced to three years as of the time of appointment (allowing the test to be taken after 2¼ years of experience). ¶ III.
The proposed agreements also included a variety of record keeping and reporting requirements. ¶ XI. In addition, damage awards (including back pay) were proposed for individual plaintiffs, for members of the plaintiff classes, and for the Vulcan Society. These amounts are relatively small, are unchallenged, and seem entirely reasonable. See 42 U.S.C. § 2000e-5(g); Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Finally, the proposed judgment contained general provisions vesting the Court with continuing jurisdiction; permitting plaintiffs to seek further relief for alleged discriminatory conduct by defendants; deeming compliance with the judgments to constitute compliance with applicable federal equal employment laws; agreeing that, if provisions of the judgment are inconsistent with state or local law or regulations, the judgment's *960 provisions would control; and providing that the Court should construe the judgment so as to effectuate its purposes. ¶ XII & XV.
The single issue on which all the parties were unable originally to reach agreement was the requirement, previously in effect in all three cities, that all applicants for firefighter positions possess a high school diploma or have passed an equivalency examination. Mount Vernon agreed to eliminate this requirement and the consent judgments it signed are still before the Court for approval. The other parties submitted to the Court for hearing and decision the question whether a high school diploma requirement could lawfully be included in the consent judgments. For purposes of the hearing, the settling parties stipulated that the requirement has an adverse impact upon minorities.

B. Objections to the Original Settlements

Notice was given of the consent judgments as originally proposed, and a hearing was held. Several persons and groups, most notably the union intervenors, appeared or submitted statements in opposition. These focused on the changes made in the written test for firefighter positions and for promotions. The changes were claimed to render the test virtually meaningless as a basis for ascertaining the presence of certain necessary abilities. Furthermore, intervenors and the City of Yonkers protested the proposed elimination of the high school diploma requirement as undermining the need to screen out incapable and unreliable individuals. The claimed overall effect of these measures was to render the proposed consent judgments contrary to the public interest.
A hearing on the high school diploma requirement developed an extensive record concerning the significance, validity, and impact of the diploma and/or an equivalency certificate. The record also contains evidence on the impact of the proposed revisions in the written examinations; the value of the diploma requirement turns in part on the availability of alternative means for assuring that applicants possess the characteristics that allegedly tend to be present more frequently in high school graduates than in nongraduates. Intervenors moved that the Court consider the entire record compiled on the high school diploma issue in deciding whether the consent judgments should be approved. This motion was granted, and that material is properly before the Court at this time.

C. The Revised Consent Judgments

After the hearing on the high school diploma requirement was complete, and after briefs had been submitted by some of the parties, White Plains and New Rochelle were able to reach agreement with all the plaintiffs on revised consent judgments. The White Plains agreement remained essentially the same as originally submitted, but included a voluntary resolution of the high school diploma issue. The parties agreed that White Plains could retain an education requirement for the position of firefighter that could be met in any of three ways: (1) by possession of a high school diploma or an equivalency certificate; (2) by equivalent experience "that demonstrates the applicant's ability to perform or learn to perform the basic duties of a firefighter," including "the ability to follow directions and to read, understand, and retain a variety of instructions, regulations and procedures at levels comparable to that ... of a high school graduate in the State of New York"; or (3) completion with a minimum grade of "C" of fire science or technology-related courses given by accredited institutions of higher education. Stipulation and Order Modifying the Proposed Consent Judgment as between Plaintiffs and the White Plains Defendants, at 3.
The New Rochelle agreement was radically revised. Instead of adopting the limitations on the written test accepted by Mount Vernon and White Plains, New Rochelle agreed to a hiring ratio. New Rochelle is free under the proposed agreement to use the written test prepared by New York State; to rank candidates by performance *961 on that test; and to accord the test 50% weight of the composite score for ranking purposes, along with 50% for the physical agility test. ¶ II(B)(3). Furthermore, while the New Rochelle agreement permits qualified applicants to be appointed as probationary firefighters although they lack a high school diploma, they must obtain one by the end of the probationary period. ¶ II(C)(1)(c). Finally, the New Rochelle agreement removes persons with a history of drug abuse from the detailed procedural protections given by New York law to persons with prior convictions. ¶ II(C)(5)(b).
New Rochelle, on the other hand, agrees to appoint members of minorities in the following ratios: one minority appointment for each white appointment until 50% of the hiring goal is met; and lesser proportions in stages as the hiring goal is approached. See ¶ II(B)(5). If necessary to maintain this hiring plan, nonresident minority applicants will be given priority over resident whites. Id. No hiring ratio is adopted for women; but New Rochelle undertakes in good faith to achieve the goal of a firefighting force consisting of 10% of women. Finally, no hiring ratio is adopted for promotions, but New Rochelle and the union agree to exert their "best efforts" to achieve the agreement's promotional goals, and to confer on the steps that should be taken if progress toward the promotions goal is not made after the first two lists of eligible candidates are established.
The New Rochelle judgments now before the Court are materially different from the original judgments signed by the City. Therefore, notice was given to the public and to all interested parties of the revised terms, and a hearing was held to entertain objections. No objections were presented. The firefighters union, although unhappy with the use of a "quota," finds the hiring ratio preferable to the provisions in the judgments agreed to by the two other cities.

II. Should the Proposed Judgments be Accepted?
The settling parties have emphatically reminded the Court of its limited role in passing upon proposed settlements. Compromises are favored to avoid expensive litigation in our busy courts, and the judgments of the parties as to their interests are entitled to deference. The views of experienced class representatives, such as the Vulcan Society, and of the United States are particularly worthy of respect. Voluntary compliance is especially important in discrimination cases; agreements may produce more favorable results for protected groups than would more sweeping judicial orders that could engender opposition and resistance. See, e. g., Alexander v. Gardner-Denver Co., 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974). A District Court must proceed in this context with an awareness of its limitations. As Judge Goldberg wrote in United States v. City of Miami, 614 F.2d 1322, rehearing granted, 625 F.2d 1310 (5th Cir. 1980):
[A] careful calibration by the trial court to ensure that the relief granted goes exactly as far, but no further, than is required by the extent of the past illegal discrimination is impossible. Before trial, there is no way of knowing which particular practices of the defendants may have contributed to the gross statistical disparities presented in their workforces.
Id. at 1332 (footnotes omitted).
Nevertheless, the standards for reviewing consent judgments in civil rights cases are generally the same as those for other types of cases. The provisions of any proposed decree must be lawful, reasonable, and equitable. United States v. City of Jackson, 519 F.2d 1147, 1151 (5th Cir. 1975). However much easier it would be for District Courts to construe this responsibility narrowly, as the settling parties desire, the potential impact of settlements upon nonconsenting parties, upon those who do not appear, and upon the approving court because of continuing jurisdiction and other responsibilities, are all matters that must be carefully considered before approval is granted. The Court of Appeals for this circuit has in several different contexts required comprehensive examination of classaction *962 settlements to determine whether they are in the public interest and are equitable to all affected parties. See, e. g., Patterson v. Newspaper & Mail Deliverers' Union, 514 F.2d 767, 771 (2d Cir. 1975), cert. denied, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976); West Virginia v. Chas. Pfizer & Co., 440 F.2d 1079 (2d Cir.), cert. denied, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971).
Among the pertinent interests that must be considered in this case are those pressed by the intervening unions, particularly the preservation of traditional civil service concepts such as power over appointments and the preservation of public safety. See generally Kirkland v. New York State Department of Correctional Services, 520 F.2d 420, 428-30 (2d Cir. 1975), cert. denied, 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976); Underwood v. New York State Office of Court Administration, 23 E.P.D. ¶ 30,981 (S.D.N.Y.1980) (Haight, J.). In addition, the court with which the settlement is filed must determine whether it violates any laws and whether, in attempting to overcome what appear to be the effects of past discrimination, the settlement treats some other group inequitably.

A. The New Rochelle Agreements

These judgments incorporate hiring ratios to achieve employment goals for Blacks and Hispanics in New Rochelle's fire department. They are unopposed. Courts have imposed ratios to eliminate disparities in employment of minorities and to overcome the effects of discriminatory selection procedures. E. g., Guardians Association of the New York City Police Department v. Civil Service Commission of New York, 630 F.2d 79 (2d Cir. 1980); Vulcan Society of the New York City Fire Department, Inc., v. Civil Service Commission of New York, 490 F.2d 387, 398 (2d Cir. 1973), aff'g 360 F.Supp. 1265 (S.D.N.Y.). It follows that appropriate ratios may be utilized voluntarily by the parties, especially when no party or interested group or individual objects, so long as a "manifest racial imbalance" in employment exists. See United Steelworkers v. Weber, 443 U.S. 193, 208, 99 S.Ct. 2721, 2730, 61 L.Ed.2d 480 (1979); Prate v. Freedman, 583 F.2d 42 (2d Cir. 1978). See also Regents of University of California v. Bakke, 438 U.S. 265, 324, 98 S.Ct. 2733, 2765, 57 L.Ed.2d 750 (1978) (Brennan, White, Marshall and Blackmun, J.J., concurring in part and dissenting in part).
The uncontroverted data in this case show that minority group members constituted 3.9% of the Fire Department employees in New Rochelle as of 1976. This is substantially below the 16.1% minority population for the City recorded in the 1970 Census. This racial imbalance, perhaps understated by use of the 1970 Census, is substantial enough to justify the voluntary adoption of a hiring ratio designed to eliminate the disparity. See International Brotherhood of Teamsters v. United States, 431 U.S. 324, 340 n.20, 97 S.Ct. 1843, 1856 n.20, 52 L.Ed.2d 396 (1977); Vulcan Society, supra, 490 F.2d at 392-93.
The hiring ratios proposed in the New Rochelle judgment are reasonable and fair to both minorities and whites. The ratios require selection of minorities in excess of their percentage in the relevant workforce. But this is only a temporary measure that commences with a relatively high ratio for minorities and declines rapidly as the racial composition of the fire department's workforce approaches the reasonable hiring goal. When the goal is achieved, use of any ratio is to cease. The judgment is fair to non-minorities, moreover, in that it creates no absolute bar to employment at any time and removes all restrictions on employment when the hiring goal is achieved. See United States v. City of Alexandria, 614 F.2d 1358, 1366 (5th Cir. 1980). The plan therefore takes "appropriate account both of the resentment of non-minority individuals against quotas of any sort and of the need of getting started to redress past wrongs." Vulcan Society, supra, 490 F.2d at 399.
Although not disputed by any party, the Court has considered the fact that no hiring ratio is included to achieve fair and lawful employment of women. No woman has ever been hired by the New Rochelle Fire *963 Department or by any other defendant department. The plaintiffs do not contend, however, that women should be hired in accordance with their presence in the workforce. Moreover, no evidence has been presented on the extent to which women have ever sought employment as firefighters in New Rochelle or with the other defendant departments. In this context, the agreement by New Rochelle to work to fulfill a hiring goal of 10% women in its fire department is fair and reasonable. In the event that this goal is not achieved, or if its modification becomes appropriate, the parties may apply to the Court for further relief.

B. The Mount Vernon and White Plains Agreements

The intervenor unions, and several individuals who submitted objections, attack the proposed judgments on the ground that the hiring procedures they adopt seem so likely to result in the hiring of incompetent firefighters that the settlements should be deemed contrary to the public interest. The settling parties seek to dismiss these arguments, in part on the ground that the unions' objections should be given only limited weight. But under the circumstances of this case, the unions' arguments must be given full and careful consideration. The intervenors' willingness to accept the New Rochelle settlement demonstrates their good faith, and firefighters have a peculiarly strong interest in the competence of their co-workers.
The argument advanced by the unions begins with the convincing premise that modern firefighting involves demanding tasks. Putting out fires is still the basic duty of fire departments, but that duty has been made increasingly complex by several factors. Modern technology has led to many more high-rise buildings, to the use of synthetic materials, and to the use of hazardous substances. These developments pose special firefighting problems. In addition, fire departments, particularly in large urban centers, are increasingly engaged in fire prevention activities, which may involve inspections of construction plans and buildings, including the fire safety system, elevators, and the electrical system. Fire prevention often includes the preparation of plans for dealing with fires of specific types in specific buildings, a form of strategic planning that requires knowledge, analytic capability, and judgment.
Fire department personnel are also called upon to communicate effectively with citizens in many different situations. Tr. 402. They must be able to prepare reports and occasionally to testify in court. Recently, fire departments have been urged to train firefighters to handle medical emergencies. Defendants' Ex. Z. These duties, in an area of great public importance  involving the preservation of life and property  have caused responsible authorities to advocate the employment of firemen who have successfully completed, in addition to high school, at least a two-year program in fire science. Tr. 298.
The record in this case also contains evidence that supports the intervenors' contentions that cognitive abilities are important for firefighter tasks. A study of firefighter duties and perceived performance, conducted for the United States Civil Service Commission, found "that the cognitive abilities underlie nearly all aspects of firefighting and that an assessment of these abilities alone may be sufficient to predict different levels of firefighter job performance." Development of a Written Test of Cognitive Abilities for Entry into the D.C. Fire Department 13 (Intervenors' Ex. C). Witnesses at the high school diploma hearing testified, moreover, that the written materials given for study or reference to entry-level firefighters in White Plains are at or near the 14th grade level in reading difficulty. Tr. 124; 233-34; 352; 407; Defendants' Ex. O, U. Some knowledge of elementary mathematics and chemistry was also shown to be necessary for competent firefighting. Finally, the intervenors are correct, as a theoretical matter, that written tests may be an appropriate method for ascertaining cognitive abilities and that a properly validated test may be used as a *964 selection device even if its use results in a disproportionate impact on minority applicants. See generally Guardians Association, supra.
From these premises, the intervenors argue against the consent judgments on two related grounds. First, they contend that the selection procedures adopted in the consent judgments ignore the importance of cognitive abilities. Second, they argue that final selections of firefighters should be based upon the ranked results of a "cognitive type test". Brief on Behalf of Intervenor-Defendants, August 19, 1980, at 26. Neither of these contentions, however, is persuasive. The New Rochelle judgments may accord greater weight to cognitive abilities than do the Mount Vernon and White Plains judgments, although that is by no means clear. Nevertheless, the parties have reached an accommodation that, under the circumstances of this case, must be accepted.
The proposed judgments do not ignore cognitive abilities. First, they provide, as the long-term remedy, that defendants are free to develop a properly validated written exam to use for testing. Second, although plaintiffs have consistently alleged that the written test presently in use is invalid, plaintiffs have agreed to permit its continued use as an interim measure, subject to several conditions. The test  and every question in the test  must pass the parties' version of the 4/5 ths Rule, and the test may only be used as a qualifying, as opposed to a ranking, device. Some evidence has been received indicating that application of the 4/5 ths Rule to individual questions may so dilute the rigor of the written exam as to render it virtually meaningless. E. g., Defendants' Ex. I; Tr. 673. The settling parties point out, however, that the New York State authorities have agreed to prepare extra questions to assure that the test remains meaningful. Plaintiffs' Joint Reply Memorandum, October 3, 1980, at 31. The 70% passing score is also unobjectionable; it is the cut-off score mandated by state regulations, New York State Department of Civil Service Regulations, Pt. 67, and is commonly used in municipal eligibility exams. Intervenors have therefore failed to establish that the test contemplated will be meaningless in ascertaining cognitive abilities. With respect to using the test for qualifying rather than ranking, the Second Circuit and the EEOC Guidelines impose a much greater burden of justification before permitting the use of tests with discriminatory impact as a ranking device than they do when the tests are used as a qualifying device. Guardians Association, supra at 101. See also Albemarle Paper Co. v. Moody, supra, 422 U.S. 405, 431, 95 S.Ct. 2362, 2378, 45 L.Ed.2d 280 (1975); Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The decision of the settling parties to refrain from using an unvalidated and possibly discriminatory test as a vehicle for ranking must, under the governing law, be regarded as reasonable and lawful. Indeed, though the record provides considerable support for the view that a written exam may be a proper way to test for cognitive abilities, little or no evidence has been developed to support the proposition that such an exam must or should be one that ranks applicants by numerical scores.
A further recognition by the settling parties of the importance of cognitive abilities is the fact that, although the high school diploma requirement is eliminated in one city and modified in the other, the cities' hiring authorities are free to consider each applicant's education and experience in making hiring decisions. Nothing in the consent judgments prevents fire department personnel from giving weight to the fact that a particular applicant is a high school graduate or a dropout, or has college training or other equivalent experience. Under New York law, moreover, departments will be free to choose one from each set of three applicants on the ranked lists, N.Y.Civil Service Law § 61 (McKinney), and educational background will be a permissible basis for favoring one applicant over another. Finally, the fact that applicants without high school diplomas will no longer automatically be eliminated from consideration for appointment is unlikely to cause a *965 significant increase in either the number or the proportion of minority or white applicants without diplomas. The hearing established to the Court's satisfaction that the overwhelming majority of all firefighter applicants are likely to be high school graduates. See e. g., Defendants' Ex. YP.
The decision of the settling parties to rely upon the physical agility test as a ranking device does not, as intervenors suggest, undermine the reliability of the selection process. Some form of ranking may be necessary to comply with state law and may be desirable as a means of narrowing the discretion exercised by hiring officials. If the physical agility test has a significant discriminatory impact on any racial group, its use may well create problems warranting judicial intervention. The parties anticipated this possibility, however, and agreed that if, contrary to present expectations, the physical agility test appears to be operating in a discriminatory manner, they will negotiate to settle the issues.
The intervenors also express concern over the impact on promotions of the settlement's hiring procedures. The sole source of officers in these fire departments is the ranks of firefighters, whose leadership qualities, intervenors contend, will be adversely affected by the alleged deemphasis of cognitive ability. Furthermore, the agreements lower the age limits for applicants for firefighter positions and reduce the time-in-grade requirements for application for officer positions. But the suggested notion that these provisions are going to lead to the appointment of incompetent, immature officers is unsupported speculation. Adequate measures have been taken to assure that only competent firefighters will be appointed, and the reduction in age and time-in-grade requirements are relatively inconsequential. Furthermore, these changes relate only to when applications for appointment or promotion may be made; they do not require appointing authorities to appoint younger applicants or to disregard the advantages of maturity. The departments also possess the power to dismiss firefighters who fail to perform adequately during the probationary period, a power that this Court assumes will be exercised by the departments so as to assure that the well-being and property of citizens and firefighters is protected.
The intervenors do not merely complain that the proposed settlements give inadequate weight to cognitive abilities. They also contend that, unless other measures are adopted for assuring minimal cognitive capacity, elimination of the high school diploma requirement is contrary to the public interest. This is another way of saying, however, that the high school diploma or its equivalent should be mandatory. Concededly, intervenors and the cities that participated in the high school diploma hearing made a strong case for permitting a fire department to retain the requirement, at least when other meaningful steps are taken to achieve responsible hiring goals. See United States v. City of Buffalo, 20 EPD ¶ 30,112 (W.D.N.Y.1980) (ordering relief in firefighter discrimination case that permits continued use of diploma requirement).[3] Most Americans, regardless of sex, race, or national origin, obtain a high school diploma; its value and importance are widely accepted in our society.[4] The diploma *966 is regarded as a minimum educational requirement by a variety of authorities on firefighting.[5] The hearing in this case proved that only limited discriminatory impact is generated by the requirement, and that effect seems likely to be overcome in time.[6] High school graduates have been found to perform in employment with greater dependability and effectiveness than non-graduates. This is especially true in the military, where the job characteristics are not dissimilar to the job of fireman. Defendants' Ex. YH, YF. High school dropouts have been found deficient in several characteristics arguably related to successful performance as a firefighter, notably verbal, mathematical, and problem-solving skills. Tr. 688. See generally Yonkers Defendants' Post-Trial Memorandum of Law, August 15, 1980, at 24-30, 55-79.
To say that a diploma requirement might be permitted under some circumstances, however, is a far cry from a court's imposing such a credential. The evidence incontrovertibly shows that the requirement has a statistically significant disparate impact upon some minority groups, particularly some Hispanics. Moreover, the requirement has not been authoritatively validated for firefighters, even empirically, and alternative measures may exist for some if not all of the capacities allegedly reflected by the diploma or its equivalent. See, e. g., Tr. 1167 (Gordon). But see Yonkers Memorandum, supra, at 80-90. In fact, the evidence shows that the diploma is not required by fire departments in many major cities, including Boston and Philadelphia, or by over half the fire departments in New York State. Plaintiffs' Ex. 19, 20. White Plains adopted the diploma requirement relatively recently; its Fire Chief and five of its officers in the past decade had not graduated high school when they were hired as firefighters. Tr. 529-30, 543-45. Even if the proposed settlements were deficient in assuring the requisite cognitive skills, adding the high school diploma requirement would provide limited additional assurance, particularly since most applicants will meet the requirement in any event. Consequently, requiring the diploma for all applicants is an insufficient reason to upset the agreements in this litigation.
*967 Intervenors also appear to argue that the settlements must include a ranked, written test with questions difficult enough to screen out a substantial number of applicants. The fundamental problem with this position is that no validated test is presently available. Given that fact, use of the test would be even less acceptable if its results were used for ranking and if increased difficulty meant increased discriminatory impact. New Rochelle will be permitted to utilize the unvalidated written test only because that City has undertaken to undo any resulting discriminatory impact by hiring a sufficient ratio of minority applicants to achieve the hiring goals.
The intervenors recognize that the present test may not be used without also using some form of hiring ratio. Although they regard a ratio or quota to be undesirable, intervenors regard such hiring as preferable to what they perceive as the dilution of hiring and promotion standards. Furthermore, intervenors note, this alleged dilution of standards in the proposed consents provides no assurance that the hiring goals in Mount Vernon and White Plains will be achieved. By contrast, the New Rochelle judgments seem certain to achieve their hiring goals, with no dilution of standards.
Intervenors' position is reasonable, especially given their antipathy to hiring ratios. The New Rochelle judgments seem certain to achieve the agreed-upon hiring goals. Furthermore, even assuming that the hiring standards in the other cities are not diluted, the New Rochelle approach leaves hiring standards and procedures in the discretion of those officials most likely to know what is in the best interests of the departments involved.
Nevertheless, the circumstances of these cases do not permit this Court to override the settlements proposed by Mount Vernon and White Plains. As explained above, the challenged settlements retain sufficient standards for hiring reasonably to assure that only competent personnel will be hired, and they leave considerable discretion in the fire departments to exclude or discharge incompetents. More significantly, the evidence of discrimination presented by plaintiffs is not so overwhelming that the Court can be sure that plaintiffs could obtain a final judgment so much more favorable than the settlements as to justify the costs of litigation. See Kuck v. Berkey Photo, Inc., 87 F.R.D. 75, 80 (S.D.N. Y.1980). The class action representative in this case is an experienced and practical organization, devoted to securing for minorities their fair share of jobs in the nation's fire departments. That the Vulcan Society is prepared to accept the absence of a hiring ratio presumably reflects a realistic and expert judgment of the evidence and the practical consequences of the changes to which defendants have agreed. In fact, recruitment procedures in the consent decrees, implemented since June 1980 by Court order, have produced 600 firefighter applicants in Mount Vernon, 80% of whom are minority group members, and in White Plains nearly 30% of all new applicants are minority group members. Memorandum on Behalf of the Mt. Vernon and White Plains Defendants, September 22, 1980, at 14-15.
Respect must also be accorded the resistance of the Mount Vernon and White Plains defendants to a quota of any kind. Defendants state: "The avoidance of court-ordered racial quotas or hiring ratios was perhaps the most significant factor in inducing the White Plains and Mount Vernon defendants to enter into these settlements." Id. at 11. Racial quotas are not a favored device and might not be ordered even were plaintiffs to prevail on the merits. See Association Against Discrimination in Employment v. City of Bridgeport, 594 F.2d 306 (2d Cir. 1979); Kirkland v. New York State Department of Correctional Services, 520 F.2d 420 (2d Cir. 1975), rehearing en banc denied, 531 F.2d 5, cert. denied, 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976); Vulcan Society, supra 490 F.2d at 398-99. Hiring ratios may turn out to be unnecessary in this case if the defendants correct recruitment practices that the EEOC found deterred large numbers of minority applicants. See Plaintiffs' Joint Memorandum *968 of Law, June 17, 1980, at 17-18. Of course, dilution of civil service standards is also disfavored by the courts, but as the Second Circuit suggested in Guardians, supra at 90-91, that is a matter ultimately in the control of a community's elected representatives, who in this situation are the responsible employers. See Incorporated Village of Hempstead, 11 N.Y.Pub.Emp.Rel.Bd. ¶ 3072 (1978).
A final consideration that warrants acceptance of the challenged judgments is this Court's capacity to prevent any seriously detrimental consequences that may thwart the overall aims of the parties. The proposed settlements establish certain goals and provide for judicial intervention upon request of either party under certain circumstances. Moreover, the agreements provide that they should be construed so as to effectuate their aims. ¶ X. Consequently, if the proposed hiring procedures do in fact have any significant discriminatory impact or other improper effect, or if the parties are incapable of dealing voluntarily with a lack of acceptable progress in reaching the hiring goals, then judicial intervention might be required to justify continued enforcement of these arrangements. Future judicial involvement is a highly undesirable prospect, and one which makes the challenged judgments less attractive. But the parties seem to be proceeding in good faith, indicating that calls for judicial intervention are unlikely, and the Court retains the authority to reject efforts to secure its involvement for all but the most serious and intractable problems.
The consent judgments proposed concerning all three cities are therefore approved.
So ordered.
NOTES
[1] There are minor differences in form between the consent judgments agreed to in the suit brought by the Vulcan Society and those agreed to in the suit brought by the United States. All references are to the consent judgments agreed to in the Vulcan suit.
[2] The EEOC concluded from its investigation that the written examinations prepared by New York State and used by the defendant cities resulted in an adverse impact on minorities. This conclusion was based on the gross under-representation of minorities on the fire department rosters. In addition, data from New Rochelle and Yonkers concerning tests administered about five years ago, as well as from a 1978 test given in all three defendant cities, resulted in disparate rates of performance, the most recent of which were statistically significant. See Plaintiffs' Joint Memorandum of Law, June 17, 1980, at 11-14. Evidence of the disparate racial impact of the promotional exam is at least as compelling. Id. 15-17.
[3] Educational requirements for employment are in general less suspect than requirements such as height and weight. Further, the burden of proving job-relatedness may be lighter when the job involved requires a high degree of skill and substantial risk to the public. E. g., Spurlock v. United Airlines, Inc., 475 F.2d 216 (10th Cir. 1972) (upholding college degree requirement for airline pilots). At least one court has weighed the validity of the high school diploma requirement for firefighters and police without empirical validation. League of United Latin American Citizens v. City of Santa Ana, 410 F.Supp. 873 (C.D.Cal.1976). Accord, United States v. City of Buffalo, 457 F.Supp. 612 (W.D.N.Y.1978) (police). The holdings in both these cases rejecting the requirement for firefighters may be correct, but the records in those proceedings appear to be less complete than that compiled in this case.
[4] Dr. Bernard Gifford's testimony was particularly impressive on this and many other points. His impeccable credentials in statistics and public policy analysis, his broad experience in education, and his active involvement in civil rights cases, including testimony in favor of the Vulcan Society in other suits, lent credibility to his views. See Defendants' Ex. YV. He strongly opposed eliminating the high school diploma requirement, both because he felt it was necessary to make it more likely that applicants would be qualified to perform the job of firefighter, and because its elimination would tend to undermine the extraordinary progress American minorities have made in matching the educational accomplishments of whites. He correctly noted that ample minority candidates with high school diplomas are available for appointment as firefighters, and that eliminating the diploma requirement would force them to compete in a pool containing many more whites without diplomas than blacks without diplomas. See Defendants' Ex. YQ.
[5] The Joint Council of Fire Service Organizations finds the high school diploma a necessary requirement for entry-level firefighters, partly because of the need to acquire further knowledge during a firefighting career. Defendants' Ex. R; Tr. 314-18. The National Commission on Fire Prevention and Control recommends at least a high school diploma and urges college level courses. Defendants' Ex. Q; Tr. 294. Richard Bland, its Chairman, felt that firefighters should all obtain associate degrees in fire technology at the approximately 120 community colleges that offer related courses. Tr. 298, 301-02, 331. Most of the firefighters and officers who testified at the hearing had taken such courses and found them useful. Recommendations of national commissions are entitled to some consideration. See Castro v. Beecher, 459 F.2d 725, 735 (1st Cir. 1972) (educational requirements for police).
[6] Defendants' Ex. YN, prepared by Dr. Gifford, shows that in 1978 the diploma requirement had no adverse impact upon young Blacks, who earned it virtually as frequently as non-Blacks. This contrasts with a ratio of 80% Blacks to whites with diplomas as recently as 1950. Defendants' Ex. YO also shows a strong trend among Blacks and Hispanics to obtain high school and college educations. By 1978, in fact, a higher proportion of Black high school graduates were going on to college than white graduates. An adverse impact on "Hispanics" is present, but it too is declining and is not observed with respect to all Spanish groups. See also Defendants' Ex. YP (showing that in 1978, dropout rate for white males exceeded that of Black males). Cf. League of United Latin American Citizens v. City of Santa Ana, 410 F.Supp. 873, 883 (C.D.Cal.1976) (finding no adverse impact upon Mexican-Americans in Santa Ana from the diploma requirement). See Defendants' Ex. YQ, YR, YW, YY.