711 F.2d 1117
 32 Fair Empl.Prac.Cas. (BNA) 509,
32 Empl. Prac. Dec. P 33,666
Edward L. KIRKLAND, Joseph P. Bates, Sr., Arthur E. Suggs,
each individually and on behalf of all others
similarly situated, Plaintiffs-Appellees,
v.
The NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES;
Thomas A. Coughlin, III, individually and in his capacity as
Commissioner of the New York State Department of
Correctional Services; the New York State Civil Service
Commission; Joseph Valenti, individually and in his
capacity as President of the New York State Civil Service
Commission and Civil Service Commissioner; Josephine
Gambino and James McFarland, each individually and in
his/her capacity as Civil Service Commissioner, Defendants-Appellees,
Frederick E. Althiser, et al., Intervenors-Appellants-Appellees,
 Nos. 828, 909, Dockets 82-7830, 82-7874.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 3, 1983.
Decided June 8, 1983.
 
 O. Peter Sherwood, New York City (Jack Greenberg, Penda D. Hair, New York City, of counsel), for plaintiffs-appellees.
 Barbara B. Butler, Asst. Atty. Gen., State of N.Y., New York City (Robert Abrams, Atty. Gen. of State of N.Y., Dennis H. Allee, First Asst. Atty. Gen., Albany, N.Y., George D. Zuckerman, Asst. Sol. Gen., Ann Horowitz, Asst. Atty. Gen., New York City, of counsel), for defendants-appellees.
 Richard R. Rowley, Albany, N.Y. (Rowley, Forrest & O'Donnell, P.C., Ronald G. Dunn, Mark T. Walsh, Jr., Albany, N.Y., of counsel), for Althiser, et al., intervenors-appellants-appellees.
 Herbert B. Halberg, New York City (Beck, Halberg & Williamson, Roman Beck, New York City, of counsel), for McClay et al., intervenors-appellees-appellants.
 Before FEINBERG, Chief Judge, and LUMBARD and KEARSE, Circuit Judges.
 LUMBARD, Circuit Judge:
 
 
 1
 Edward Kirkland and other minority Correction Sergeants in the New York State Department of Correctional Services ("DOCS") brought this class action on January 15, 1982 alleging that Promotional Examination No. 36-808 ("Exam 36-808"), given on October 3, 1981 for the position of Correction Lieutenant by DOCS and the New York Civil Service Commission ("CSC"), and Exam 36-808's resulting eligibility list are racially discriminatory against blacks and hispanics in violation of, inter alia, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 (1976 and Supp. IV 1980).[1] On August 20, 1982, pursuant to Fed.R.Civ.P. 23(e), the parties submitted proposals of settlement to Judge Griesa of the Southern District of New York. After due notice, Judge Griesa held hearings on September 29 and October 4 and 14, 1982 during which he heard objections from two groups of non-class members ("intervenors"), i.e., non-minority correctional officers, who, at the September 29, 1982 hearing, had been permitted to intervene on the condition that their intervention would be solely for the purpose of objecting to the proposed settlement. On November 9, 1982, Judge Griesa approved the settlement and filed an opinion on December 1, 1982. 552 F.Supp. 667. In their appeal, intervenors challenge Judge Griesa's grant of conditional intervention as well as his approval of the settlement. On November 16, 1982, on intervenors' motion, we stayed Judge Griesa's order of approval and expedited argument of the appeal. We affirm.
 
 I. BACKGROUND
 
 2
 A. Exam 36-808 and its Resulting Eligibility List.
 
 
 3
 Exam 36-808, a written test consisting of sixty multiple choice items, was administered by CSC on October 3, 1981 to 739 candidates, of whom 169 (22.9%) were minority. Of the 625 candidates who passed the test, 148 (22.0%) were minority. Thus, minority candidates had an overall pass rate of 88% (148 out of 169 minority candidates passed), only slightly below the 92% pass rate of non-minorities (527 out of 570 non-minority candidates passed).
 
 
 4
 On December 23, 1981, CSC certified an eligibility list ranking the passing candidates according to their final scores, which were calculated by adding seniority and veterans' credits to the candidates' adjusted scores.[2] Although the overall minority representation on the eligibility list (22.0%) was approximately the same as the minority representation in the total candidates pool (22.9%), minority representation within the eligibility list's rank-ordering system was disproportionately low at the list's top and high at the list's bottom.[3] A racial/ethnic breakdown of the candidates' raw scores, which reflect only the number of correct answers given, shows that the awarding of seniority and veterans' credits to qualifying candidates did not play a significant role in causing the uneven distribution of minorities on the eligibility list.[4]
 
 
 5
 Appointments according to rank-order on the eligibility list began in early January, 1982. Of 171 initial appointments, 17 (9.9%) were minority. By July 28, 1982, 222 candidates had been promoted to Correction Lieutenant, of whom only 20 (9.0%) were minority. As of September 29, 1982, 225 appointments had been made, of which 21 (9.3%) went to minority candidates.
 
 
 6
 B. The Settlement Agreement.
 
 
 7
 On January 15, 1982, immediately after the first appointments from the eligibility list, plaintiffs brought this class action. They alleged that DOCS, CSC, and their high officers had engaged in unlawful discrimination against blacks and hispanics in the development and administration of Exam 36-808 and in the use of the resulting eligibility list to make permanent promotional appointments to the position of Correction Lieutenant. Plaintiffs contended that Exam 36-808 was discriminatory because (1) it resulted in a disproportionately low number of minority appointments and (2) it was not job-related. The complaint sought an injunction against the continued use by defendants of all racially discriminatory practices, damages in the form of back pay for alleged past discrimination, and other relief, including the development of non-discriminatory selection procedures for promotion and the implementation of steps to redress the discriminatory effects of Exam 36-808 and its resulting eligibility list.
 
 
 8
 In August 1982, following seven months of discovery proceedings and extensive settlement negotiations, the parties entered into a settlement agreement which contains two basic elements "to assure that minorities by reason of their race are not disadvantaged by the employment policies, procedures and practices within ... [DOCS], and that any disadvantage to minorities which may have resulted from the use of Examination No. 36-808 is remedied as provided herein so that equal opportunity will be provided for all." Settlement Agreement art. I(7). First, it provides measures to adjust the current eligibility list to eradicate all disproportionate racial impact. Second, it provides for the development and administration of new selection procedures for promotion to Correction Lieutenant and Correction Captain which will be employed after the current eligibility list for Exam 36-808 has been exhausted.[5]
 
 
 9
 1. Adjustment of the Current Eligibility List.
 
 
 10
 The agreement provides that all candidates who have received appointments from the eligibility list will retain their appointments and that appointments will continue until the list is fully exhausted, i.e., "until every eligible on the 36-808 List has been offered an appointment and has been afforded a reasonable opportunity to either accept or decline." Settlement Agreement art. VI(5)(c). The agreement seeks to eliminate the eligibility list's adverse impact on minorities by modifying its rank-ordering system. All candidates who passed Exam 36-808, including those candidates who have already been appointed, are to be placed into three zones based on their final test scores which, as discussed above, include seniority and veterans' credits.[6] Of the 225 appointments which had been made by September 29, 1982, most were offered to candidates who would place in the highest zone.[7]
 
 
 11
 The agreement contains the following procedures to govern future promotions from the eligibility list.[8] All candidates falling within a single zone are to be deemed to be of equal fitness and will be ranked within their zone by random selection. Appointments will then be offered by rank order to those candidates in the highest unexhausted zone. However, these appointments will first be offered to minority candidates in this zone until minority appointments amount to 21% of all appointments made, a number approximately reflecting the percentage of minorities on the eligibility list.[9] Thereafter, appointments will be made in a ratio of 4 to 1, non-minority to minority, until the eligibility list is exhausted. In any event, no minority applicant in a lower zone will be eligible for appointment until appointments have been offered to all candidates, regardless of race, in the highest unexhausted zone. Finally, candidates will only be offered appointments to facilities or locations at which they have expressed a willingness to serve. If no minority candidate has designated the facility or location at which a vacancy occurs, the appointment will be offered to non-minority candidates notwithstanding the fact that the 21% ratio has not been achieved.
 
 
 12
 2. Future Promotional Procedures for Correction Lieutenant and Correction Captain.
 
 
 13
 The agreement also requires the parties to work toward the development of new selection procedures for promotion to Correction Lieutenant and Correction Captain which do not have an adverse racial impact and which are job-related. These procedures are to be employed after the current eligibility list is exhausted. The agreement requires defendants to "consider the possibility of alternatives or supplements to written examinations, including use of oral examination or assessment center techniques," Settlement Agreement art. VI(7)(c), but it does not mandate adoption of any specific approach. In short, the agreement suggests various procedures that have been used successfully in other situations to insure that future selection processes are not racially discriminatory.
 
 
 14
 C. The Proceedings in the District Court.
 
 
 15
 The settlement agreement was submitted to Judge Griesa on August 20, 1982 for approval pursuant to Fed.R.Civ.P. 23(e). Pursuant to an order of Judge Griesa, due notice was given to members of the plaintiff class and to each candidate on the eligibility list who had not yet been appointed that objections would be heard on September 29, 1982. The notice included a summary of the settlement's terms and a statement that any DOCS employee could file objections to the settlement with the district court.
 
 
 16
 Two groups of non-class member/non-minority correctional officers appeared at the September 29, 1982 hearing and sought intervention. After hearing the proposed intervenors' objections to the settlement and their application for intervention, Judge Griesa, considering intervenors' application to be a request for permissive intervention under Fed.R.Civ.P. 24(b), ruled from the bench that "the intervenors are permitted to intervene for the sole purpose of objecting to the settlement ...." Judge Griesa stated that he was limiting the intervention primarily because the application was untimely. He found that intervenors had known of the action since its inception, and that although they were present at a July 14, 1982 conference at which the terms of the settlement were fully discussed, they did not then press for intervention and in fact appeared to favor the concepts and general terms of the settlement. Accordingly, Judge Griesa believed that it would be unfair to grant unlimited intervention because the parties "through hard work, careful thought and extensive negotiation" had decided "that there was no need for a trial and that there could be a settlement," while intervenors had taken no formal steps to intervene until after a settlement had been reached. He also noted that there was a "serious question" whether intervenors, even if granted unconditional intervention, would have sufficient standing beyond that enabling them to object to the settlement to require a full blown trial at which they would be permitted to defend the validity of Exam 36-808.
 
 
 17
 Additional hearings were held on October 4 and 14, and the parties and intervenors thereafter submitted briefs. On November 9, 1982, Judge Griesa issued an order approving the settlement on the grounds that it was "fair, reasonable and lawful in all respects" and that the intervenors' objections were "without merit." In his subsequent opinion of December 1, 1982, 552 F.Supp. 667, Judge Griesa wrote:
 
 
 18
 The present settlement agreement is not only justified by legal precedent, but is inherently reasonable and sound as a matter of policy. The benefits to plaintiff class of minority applicants inevitably result in some detriment to non-minority correctional officers competing for promotion to the rank of Lieutenant. However, the benefits to plaintiff class are modest and are carefully tailored to the precise problem raised by them in litigation. By the same token, the detriment to the non-minority applicants is also modest and is in fact considerably less than what might have occurred if plaintiffs had pressed their litigation to the end and not agreed to a settlement [i.e., those appointments already made could have been declared null and void].
 
 
 19
 Id. at 671.
 
 
 20
 Specifically, Judge Griesa found that the statistical demonstration of the eligibility list's disproportionate racial impact established a prima facie case of Title VII discrimination under Castaneda v. Partida, 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977), and held that a reasonable basis therefore existed for entering into a settlement creating race-conscious remedies. 552 F.Supp. at 670, 672-75. Next, he determined that the remedies provided by the settlement were neither unreasonable nor unlawful on the grounds that the adjustment of the eligibility list into zones did not violate either state law or intervenors' federal constitutional rights and that the settlement's racial preference procedures did not constitute an unconstitutional quota. Id. at 675-77.
 
 
 21
 Intervenors challenge Judge Griesa's September 29, 1982 grant of conditional intervention and his subsequent approval of the settlement. On November 16, 1982, we granted intervenors' motion for a stay of Judge Griesa's order and expedited argument of the appeal.[10] Thereafter, a third group of correctional officers, consisting of Correction Sergeants not on the current eligibility list but eligible to take the next examination for promotion to Correction Lieutenant, sought leave to intervene for, inter alia, the limited purpose of urging that a four year maximum life be imposed on the current eligibility list. We denied the motion and instead granted these proposed intervenors leave to file briefs as amici curiae.
 
 II. THE QUESTION OF CONDITIONAL INTERVENTION
 
 22
 Questions relating to the scope and nature of intervention are attaining increasing importance in cases involving the approval of consent decrees or stipulations which, in settling employment discrimination suits, create race--or sex-conscious hiring or promotional remedies that affect non-complaining employees. See, e.g., Stotts v. Memphis Fire Department, 679 F.2d 579 (6th Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 297, 74 L.Ed.2d 280 (1982) ("Stotts II "); Culbreath v. Dukakis, 630 F.2d 15 (1st Cir.1980); Airline Stewards & Stewardesses Association, Local 550 v. American Airlines, Inc., 573 F.2d 960 (7th Cir.1978) (per curiam), cert. denied, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1979); Equal Employment Opportunity Commission v. American Telephone & Telegraph Co., 556 F.2d 167 (3d Cir.1977), cert. denied, 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978). Judge Griesa permitted the non-class member/non-minority intervenors to intervene, limiting their intervention to objecting to the proposed settlement, as he held their application was untimely. For different reasons, we agree that intervention should have been so limited.
 
 
 23
 Intervenors' reason for challenging Judge Griesa's grant of conditional intervention is their belief that, if afforded full intervention, they would have equal standing with the original parties; thus, their consent to the agreement would be required, and, in the event that they were dissatisfied with the agreement, they could then force a trial at which they would be permitted to defend the validity of Exam 36-808. We disagree.
 
 
 24
 As Judge Griesa suggested at the September 29, 1982 hearing, the sum of rights possessed by an intervenor, even if granted unconditional intervention, is not necessarily equivalent to that of a party in a case and depends upon the nature of the intervenor's interest. See Boston Tow Boat Co. v. United States, 321 U.S. 632, 64 S.Ct. 776, 88 L.Ed. 975 (1944); Airline Stewards & Stewardesses Association, Local 550 v. American Airlines, Inc., supra, 573 F.2d at 964; Equal Employment Opportunity Commission v. American Telephone & Telegraph Co., supra, 556 F.2d at 173; see also Shapiro, Some Thoughts on Intervention Before Courts, Agencies, and Arbitrators, 81 Harv.L.Rev. 721, 727 (1968) [hereinafter Shapiro]. Non-minorities do not have a legally protected interest in the mere expectation of appointments which could only be made pursuant to presumptively discriminatory employment practices. See Franks v. Bowman Transportation Co., 424 U.S. 747, 775-78, 96 S.Ct. 1251, 1269-1270, 47 L.Ed.2d 444 (1976); Stotts II, supra, 679 F.2d at 583-84 & n. 3; Equal Employment Opportunity Commission v. American Telephone & Telegraph Co., supra, 556 F.2d at 173. Accordingly, the legal rights of non-minorities generally are not adversely affected by reasonable and lawful race-conscious hiring or promotional remedies, whether such remedies are imposed by court order following litigation on the merits or are created by voluntary agreement between the parties. See Stotts II, supra, 679 F.2d at 583; Stotts v. Memphis Fire Department, 679 F.2d 541, 554, 556, 558 (6th Cir.1982), cert. granted, --- U.S. ----, 103 S.Ct. 2451, 75 L.Ed.2d ---- (1983) ("Stotts I "); Setser v. Novack Investment Co., 657 F.2d 962, 970 (8th Cir.1981) (en banc); Prate v. Freedman, 583 F.2d 42, 47 (2d Cir.1978); Equal Employment Opportunity Commission v. American Telephone & Telegraph Co., supra, 556 F.2d at 173. It follows, therefore, that although non-minority third parties allowed to intervene in cases which involve consent decrees or settlement agreements implementing race-conscious hiring or promotional remedies do have a sufficient interest to argue that the decree or agreement is unreasonable or unlawful, their interest in the expectation of appointment does not require their consent as a condition to any voluntary compromise of the litigation. See Airline Stewards & Stewardesses Association, Local 550 v. American Airlines, Inc., supra, 573 F.2d at 964; Equal Employment Opportunity Commission v. American Telephone & Telegraph Co., supra, 556 F.2d at 173 (interests of a third party in a consent decree limited to appropriateness of the remedy); see also Stotts II, supra, 679 F.2d at 584 n. 3 (dictum); Stotts I, supra, 679 F.2d at 554; In re Fine Paper Litigation State of Washington, 632 F.2d 1081, 1087 (3d Cir.1980); Kirkland Sergeants, 520 F.2d 420, 424 (2d Cir.1975), cert. denied, 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976); Shapiro, supra, at 756 n. 157 ("It might ... be possible to hold that persons allowed to intervene in a consent decree proceeding could argue ... that the decree was inadequate but could not veto the entrance of the decree ...."). Indeed, a rule indiscriminately enabling all intervenors in these cases to veto proposed compromises would seriously hamper efforts to settle Title VII cases, see Airline Stewards & Stewardesses Association, Local 550 v. American Airlines, Inc., supra, 573 F.2d at 963, thereby frustrating Congress's expressed preference for achieving Title VII compliance by voluntary means. See, e.g., Alexander v. Gardner-Denver Co., 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974); Berkman v. City of New York, 705 F.2d 584, 597 (2d Cir.1983).
 
 
 25
 United States v. City of Miami, 664 F.2d 435 (5th Cir.1981) (en banc), is not to the contrary. Reviewing the approval of a Title VII consent decree between the government and the defendant-city, the panel decision in that case, 614 F.2d 1322 (5th Cir.1980), aff'd in part and rev'd in part, 664 F.2d 435 (1981) (en banc), held:
 
 
 26
 Unless the FOP [the named defendant-union] can demonstrate that it has been ordered to take some action by the [consent] decree, or ordered not to take some action, or that its rights or legitimate interests have otherwise been affected, it has no right to prevent the other parties and the Court from signing the decree.
 
 
 27
 Id. at 1329 (footnotes omitted) (emphasis supplied). None of the separate opinions in the en banc decision expressly disputed this rule. See 664 F.2d at 447 (plurality opinion); id. at 452-53 (Gee, J., concurring in part and dissenting in part); id. at 453 (Tjoflat, J., dissenting); id. at 462 (Johnson, J., concurring in part and dissenting in part). Instead, contrary to the panel's determination, a majority of the en banc court held that the consent decree did in fact adversely affect the defendant-union's legally protected interests "insofar as it deprive[d] the FOP and its members of the benefit of the promotion procedure that was in effect a part of the FOP contract [i.e., collective bargaining agreement] with the [defendant] City." Id. at 447 (plurality opinion); see id. at 452-53 (Gee, J., concurring in part and dissenting in part). Thus, the defendant-union's consent was required before the decree could be approved not because of its mere status as a full defendant in the case, but because the decree bound the defendant-union to a compromise which altered its contractual rights.[11]
 
 
 28
 Intervenors contend, however, that like the defendant-union in the City of Miami, they possessed specific contractual rights under their union's collective bargaining agreement with the state which would be impaired by the settlement agreement. We disagree. In City of Miami, the relevant contract provision, entitled "Prevailing Benefits," provided in pertinent part:
 
 
 29
 All job benefits in effect at the time of the execution of this [A]greement heretofore authorized ... [by ordinance], not specifically provided for or abridged by this [A]greement, shall remain in full force and effect for the duration of this Agreement.
 
 
 30
 The City and the Employee Organization will ... negotiate any proposed changes in those rights and benefits not specifically covered by this Agreement, provided however no changes shall be made except by mutual consent and any impasse shall not be subject to the Impasse Resolution as provided for in [the Agreement].
 
 
 31
 664 F.2d at 446 (emphasis supplied). Holding that this provision prevented the defendant-city from altering all relevant, existing ordinances without the defendant-union's consent, the court ruled that the defendant-union had a clear contractual right in the existing Miami Civil Service Ordinance, which provided for promotion procedures, and that the existence of this right prevented the approval of a consent decree altering the promotion procedures without the defendant-union's concurrence. Id. at 446-47; id. at 452 (Gee, J., concurring in part and dissenting in part). The collective bargaining agreement in the present case between intervenors' union and the state contains only one provision that could possibly encompass promotion procedures. Entitled "Preservations of Benefits," article 27 of the agreement provides:
 
 
 32
 With respect to matters not covered by this Agreement, the Employer will not seek to diminish or impair during the term of this Agreement any benefit or privilege provided by law, rule or regulation for employees without prior notice to the Union and when appropriate, without negotiations with the Union provided, however, that this Agreement shall be construed consistent with the free exercise of rights reserved to the Employer by Article 6 of this Agreement.
 
 
 33
 (Emphasis supplied). Article 6, in turn, provides that "[e]xcept as expressly limited by other provisions of this Agreement, all of the authority, rights and responsibilities possessed by the Employer are retained by it." (Emphasis supplied). The difference between these provisions and the City of Miami provision is clear. Unlike the City of Miami provision, the plain language of articles 6 and 27 leaves unimpaired the New York State CSC's authority over examinations and eligibility lists, which affords it wide discretion to choose and modify the procedures it sees fit to determine merit and fitness. See, e.g., Katz v. Hoberman, 28 N.Y.2d 530, 319 N.Y.S.2d 73, 267 N.E.2d 886 (1971); Metzger v. Nassau County Civil Service Commission, 54 A.D.2d 565, 386 N.Y.S.2d 890 (2d Dep't 1976). Accordingly, it cannot be said that these provisions give intervenors a specific contractual right in the preservation of their positions on Exam 36-808's eligibility list.[12]
 
 
 34
 The only interest, therefore, that intervenors possess is their mere expectation of promotion pursuant to possibly discriminatory selection procedures. This interest alone, though it entitles intervenors to be heard on the reasonableness and legality of the agreement, is not so strong as to require their consent to the agreement. Thus, Judge Griesa granted intervenors the intervention rights to which their interest entitled them when he permitted them to intervene solely to object to the settlement. See Airline Stewards & Stewardesses, Local 550 v. American Airlines, Inc., supra, 573 F.2d at 964; Equal Employment Opportunity Commission v. American Telephone & Telegraph Co., supra, 556 F.2d at 173. Accordingly, we reject intervenors' challenge to Judge Griesa's grant of conditional intervention without reaching the question of timeliness.[13] We note, however, that if intervenors' application was in fact untimely, it would have been within Judge Griesa's discretion to deny them any form of intervention. See, e.g., Stotts II, supra, 679 F.2d at 582-86; Culbreath v. Dukakis, supra, 630 F.2d at 20-25.
 
 
 35
 III. THE PROPRIETY OF APPROVING THE SETTLEMENT AGREEMENT
 
 
 36
 It is settled that voluntary compliance is a preferred means of achieving Title VII's goal of eliminating employment discrimination. See, e.g., Carson v. American Brands, Inc., 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14, 67 L.Ed.2d 59 (1981); Alexander v. Gardner-Denver Co., supra, 415 U.S. at 44, 94 S.Ct. at 1017; Berkman v. City of New York, supra, 705 F.2d at 597; Williams v. City of New Orleans, 694 F.2d 987, 991 (5th Cir.1982), reh'g granted, No. 82-3435 (Feb. 14, 1983); Patterson v. Newspaper & Mail Deliverers' Union, 514 F.2d 767, 771 (2d Cir.1975), cert. denied, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976). Accordingly, voluntary compromises of Title VII actions enjoy a presumption of validity,[14] see, e.g., United States v. City of Alexandria, 614 F.2d 1358, 1359, 1362 (5th Cir.1980); Vulcan Society of New York City Fire Department, Inc. v. City of New York, 96 F.R.D. 626, 629 (S.D.N.Y.1983), and should therefore be approved "unless ... [they] contain[ ] provisions that are unreasonable, unlawful, or against public policy." Berkman v. City of New York, supra, 705 F.2d at 597; see also United States v. City of Miami, supra, 664 F.2d at 441 (voluntary compromise affecting third parties should be approved only if the court is "satisfied that the effect on them is neither unreasonable nor proscribed") (plurality opinion). We have recently held that "the district court's approval of a [Title VII] settlement should be upheld unless it constituted an abuse of discretion." Berkman v. City of New York, supra, at 597; see also Patterson v. Newspaper & Mail Deliverers' Union, supra, 514 F.2d at 771.
 
 
 37
 The probability of plaintiffs' success on the merits and the range of possible relief are factors that courts have considered important in determining whether a Title VII class action settlement agreement should be approved. See, e.g., Reed v. General Motors Corporation, 703 F.2d 170, 172 (5th Cir.1983); Plummer v. Chemical Bank, 668 F.2d 654, 660 (2d Cir.1982); see also Carson v. American Brands, Inc., supra, 450 U.S. at 88 n. 14, 101 S.Ct. at 998 n. 14; City of Detroit v. Grinnell Corporation, 495 F.2d 448, 455 (2d Cir.1974). See generally 7A C. Wright & A. Miller, Federal Practice and Procedure § 1797, at 230-31 (1972). We believe that when such a settlement implements race-conscious remedies, these factors can be encompassed by two central inquiries: (1) whether there is an existing condition which can serve as a proper basis for the creation of race-conscious remedies; and (2) whether the specific remedies of the compromise agreement are neither unreasonable nor unlawful. See Stotts I, supra, 679 F.2d at 552-53; Setser v. Novack Investment Co., supra, 657 F.2d at 967 & n. 4. Intervenors' objections follow these two questions and can be summarized as follows: (1) that before any race-conscious relief can be granted to plaintiff class, there must be a judicial determination that Exam 36-808 and its resulting eligibility list are not job-related and are therefore racially discriminatory, i.e., a mere statistical showing of disproportionate impact does not amount to a proper basis for settlement; and (2) that in any event, the terms of the settlement agreement are unreasonable and unlawful.
 
 
 38
 A. The Proper Basis for Settlement.
 
 
 39
 Judge Griesa, finding that the statistical demonstration of the eligibility list's disproportionate racial impact established a prima facie case of Title VII discrimination, 552 F.Supp. at 670, determined that this case alone served as a "sufficient showing of serious questions of racial discrimination under Title VII" to justify a settlement containing race-conscious remedies. Id. at 675. Intervenors, however, argue that because the district court did not consider the validity of Exam 36-808, its approval rested on an inadequate foundation and thus should be reversed. Intervenors also assert that, in any event, Judge Griesa erred in finding a prima facie case of discrimination. We find no merit in these contentions.
 
 
 40
 1. The Prima Facie Case as the Proper Basis.
 
 
 41
 The gist of intervenors' first contention is that because § 703(h) of Title VII, 42 U.S.C. § 2000e-2(h) (1976), provides that a "professionally developed ability test" is not unlawful even though it results in a disparate impact, a judicial determination that Exam 36-808 was not job-related, and thus not a "professionally developed ability test," see Griggs v. Duke Power Co., 401 U.S. 424, 436, 91 S.Ct. 849, 856, 28 L.Ed.2d 158 (1971), was required before a proper basis for settlement could exist. Intervenors' argument, however, would turn Title VII law on its head since, as intervenors themselves concede, job-relatedness is never presumed and only becomes an issue after it is affirmatively raised by the defendant. See Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); Griggs v. Duke Power Co., supra, 401 U.S. at 432, 91 S.Ct. at 854. Moreover, if intervenors' position were adopted, no Title VII testing case could be settled by agreement until a judicial determination on the test's job-validity was made. Such a result would seriously undermine Title VII's preference for voluntary compliance and is not warranted. See Regents of University of California v. Bakke, 438 U.S. 265, 364, 98 S.Ct. 2733, 2785, 57 L.Ed.2d 750 (Brennan, J., concurring in part and dissenting in part); Equal Employment Opportunity Commission v. Safeway Stores, Inc., 611 F.2d 795, 801 (10th Cir.1979), cert. denied, 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 809 (1980).
 
 
 42
 Neither Title VII nor the Constitution prohibits compromise agreements implementing race-conscious remedies which are agreed to prior to a judicial determination on the merits. See United Steelworkers of America v. Weber, 443 U.S. 193, 207-08, 99 S.Ct. 2721, 2729, 61 L.Ed.2d 480 (1979) (Title VII); Regents of University of California v. Bakke, supra, 438 U.S. at 265, 301-02 & n. 41, 98 S.Ct. 2733, 2753-54 n. 41, 57 L.Ed.2d 750 (Powell, J., announcing the judgment of the Court) (fourteenth amendment); see also Prate v. Freedman, supra, 583 F.2d at 47 n. 4 ("Our decision in United States v. Wood, Wire & Metal Lathers International Union, Local 46, [471 F.2d 408 (2d Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973) ] ... foreclosed the argument that preferential hiring relief may only be based on a formal finding of past discrimination made after an evidentiary hearing."). In class actions, the principal requirement for such a settlement is that there be a reasonable basis for the compromise, i.e., some showing of probability of success on the merits. See, e.g., Reed v. General Motors Corporation, supra, 703 F.2d at 172; Plummer v. Chemical Bank, supra, 668 F.2d at 659-60; Setser v. Novack Investment Co., supra, 657 F.2d at 968. When the settlement contains race-conscious relief affecting third parties, some well substantiated claim of racial discrimination against the plaintiff class is necessary "to ensure that new forms of invidious discrimination are not approved in the guise of [race-conscious remedies]." Setser v. Novack Investment Co., supra, 657 F.2d at 968; see also Valentine v. Smith, 654 F.2d 503, 508 (8th Cir.), cert. denied, 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981); Vulcan Society of New York City Fire Department, Inc. v. City of New York, supra, 96 F.R.D. at 629.
 
 
 43
 We agree with Judge Griesa that a showing of a prima facie case of employment discrimination through a statistical demonstration of disproportionate racial impact constitutes a sufficiently serious claim of discrimination to serve as a predicate for a voluntary compromise containing race-conscious remedies. See Stotts I, supra, 679 F.2d at 552; Setser v. Novack Investment Co., supra, 657 F.2d at 968; Vulcan Society of Westchester County, Inc. v. Fire Department of City of White Plains, 505 F.Supp. 955, 962 (S.D.N.Y.1981).[15] A statistical showing of adverse impact creates a "presumption of Title VII discrimination," Guardians Association of New York City Police Department, Inc. v. Civil Service Commission, 630 F.2d 79, 88 (2d Cir.1980), cert. denied, 452 U.S. 940, 101 S.Ct. 3083, 69 L.Ed.2d 954 (1981), which, if unrebutted by any showing that the contested practice was job-related, requires the court to enter a decree finding unlawful discrimination. Id. at 88; see Texas Department of Community Affairs v. Burdine, supra, 450 U.S. at 253-54, 101 S.Ct. at 1093-94; Albemarle Paper Co. v. Moody, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). Such a finding, in turn, gives the district court "broad, although not unlimited, power to fashion the [race-conscious] relief it believes appropriate." Berkman v. City of New York, supra, 705 F.2d at 594. Accordingly, because a judicial finding of unlawful discrimination under Title VII allowing the imposition of race-conscious remedies can be made on the showing of a prima facie case when the defendant fails to rebut the case, we think that an unrebutted prima facie case is sufficient to serve as a proper basis for a settlement containing race-conscious remedies when the defendant chooses to enter into a compromise. See Prate v. Freedman, supra, 583 F.2d at 47. Simply stated, a defendant's entrance into a compromise without rebutting an established prima facie case amounts to an admission of unlawful discrimination for purposes of Title VII.[16] Id. at 47; see also United States v. City of Miami, supra, 664 F.2d at 442.
 
 
 44
 2. The Prima Facie Case.
 
 
 45
 Intervenors next assert that, in any event, there existed no basis for the settlement since Judge Griesa erred in finding a prima facie case of discrimination. We disagree.
 
 
 46
 Judge Griesa determined that a prima facie case of employment discrimination had been established after reviewing the statistics relevant to Exam 36-808 and its eligibility list. 552 F.Supp. at 670. Finding that the difference between the percentage of minorities actually appointed as of July 28, 1982 (9.0%) and the percentage which would be expected to be appointed from a random selection amounted to the level of 5.86 standard deviations,[17] Judge Griesa ruled that the statistics made out a prima facie case of Title VII discrimination under Castaneda v. Partida, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). Castaneda stated that, in cases involving significant statistical samples, "if the difference between the expected value [from a random selection] and the observed number is greater than two or three standard deviations," a prima facie case is established since the deviation then could only be regarded as caused by some factor other than chance. Id. at 496 n. 17, 97 S.Ct. at 1281 n. 17.
 
 
 47
 Intervenors do not challenge Judge Griesa's use of the Castaneda test, but rather, for the first time on appeal, they assert that he did not apply the law to the appropriate set of facts. They contend that Judge Griesa's use of the final test scores as a statistically significant sample was improper because these scores reflected the addition of seniority and veterans' credits which may have caused the uneven distribution of minorities on the eligibility list. We disagree. A breakdown of the candidates' raw scores, see note 4 supra, shows that the awarding of seniority and veterans' credits did not play an appreciable role in creating the uneven distribution. Accordingly, Judge Griesa's use of the final scores could not have resulted in error. See Kirkland Sergeants, supra, 520 F.2d at 425 (racially disproportionate impact need not be proven with complete mathematical certainty); Vulcan Society of New York City Fire Department, Inc. v. Civil Service Commission, 490 F.2d 387, 393 (2d Cir.1973) (same).
 
 
 48
 Intervenors next contend that the number of actual minority appointments does not show disproportionate impact because this number does not account for the number of minorities who refused offers of appointment. Again, if it was improper for Judge Griesa not to consider this factor, such a measure was harmless since, based on the figures offered by intervenors themselves, the refusal rate for minorities was approximately equal to the refusal rate of non-minorities.
 
 
 49
 Intervenors' final contention is that the disproportionate distribution on the eligibility list was caused by the fact that a large number of the minority candidates had recently been transferred to DOCS from the state's Office of Drug Abuse and thus took Exam 36-808 with minimal DOCS experience. This contention is also without merit. Although lack of experience may be relevant to the question of a test's job-validity, it does not affect the question whether a prima facie case has been properly established. See Albemarle Paper Co. v. Moody, supra, 422 U.S. at 425, 95 S.Ct. at 2375; Griggs v. Duke Power Co., supra, 401 U.S. at 433-36, 91 S.Ct. at 854-56. Moreover, differences in responsibility between Office of Drug Abuse officers and officers working at minimum and medium security DOCS facilities has been held to be negligible. Stokes v. New York State Department of Correctional Services, No. 80 Civ. 1364 (S.D.N.Y. Sept. 27, 1982).
 
 
 50
 Accordingly, we agree with Judge Griesa that a sufficient basis existed for the parties to enter into the settlement agreement.
 
 
 51
 B. The Reasonableness and Legality of the Settlement Agreement.
 
 
 52
 Because the settlement agreement was submitted for approval without any judicial determination on the merits, the reasonableness and legality of the agreement under federal law must be measured against the allegations of the complaint and the relief which might have been granted had the case gone to trial.[18] United States v. City of Alexandria, supra, 614 F.2d at 1364. Simply stated, the remedies provided by a Title VII settlement, especially those containing race-conscious relief, must be substantially related to the objective of eliminating the alleged instance of discrimination, see Stotts I, supra, 679 F.2d at 553; Valentine v. Smith, supra, 654 F.2d at 510; United States v. City of Alexandria, supra, 614 F.2d at 1366; Detroit Police Officers' Association v. Young, 608 F.2d 671, 696 (6th Cir.1979), cert. denied, 452 U.S. 938, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981), and must not unnecessarily trammel the interests of affected third parties. See United Steelworkers of America v. Weber, supra, 443 U.S. at 208, 99 S.Ct. at 2729; United States v. City of Alexandria, supra, 614 F.2d at 1366.
 
 
 53
 The alleged discrimination was the administration of Exam 36-808 and the use of its resulting eligibility list. As previously discussed, the entrance of defendants into the settlement in the face of plaintiffs' unrebutted prima facie case of discrimination amounts to an admission that the practice giving rise to the prima facie case, i.e., Exam 36-808 and its eligibility list was in violation of Title VII. We agree with Judge Griesa that the agreement's provisions mandating the development of new selection procedures and adjusting the current eligibility list are reasonable and legal since they substantially relate to the objective of eradicating the discriminatory impact caused by Exam 36-808 and its eligibility list and are not overly oppressive to the interests of non-minorities.
 
 
 54
 1. Future Selection Procedures.
 
 
 55
 The settlement agreement requires the parties to cooperate in the development of new selection procedures for promotion to Correction Lieutenant and Correction Captain, which are to be used after the exhaustion of the current eligibility list. The agreement encourages abandonment of the written test as the sole indicator of merit and urges the creation of racially neutral selection procedures better designed to assess the candidates' abilities. This part of the settlement, which intervenors do not challenge, operates solely to eliminate the adverse effect of Exam 36-808 and to assure compliance with Title VII in the future. Moreover, it does not trammel any interests of non-minorities. Thus, it is a proper remedy under the circumstances. Berkman v. City of New York, supra, 705 F.2d at 595-96; Guardians Association of New York City Police Department, Inc. v. Civil Service Commission, supra, 630 F.2d at 109.
 
 
 56
 2. Adjustment of Rank-Ordering into Zones.
 
 
 57
 Intervenors do, however, object to the settlement's provisions adjusting the eligibility list's rank-ordering system into zones. They contend that the modification of the list is not a proper Title VII remedy since it imposes a procedure by which candidates will be appointed without regard to merit or fitness and that, in any event, the positions of candidates on the eligibility list constituted vested property rights which could not be altered without due process of law. We find no merit in these contentions.[19]
 
 
 58
 Recognizing the fact that small differences between the scores of candidates indicate very little about the candidates' relative merit and fitness, we have held that as a means of insuring compliance with Title VII "the employer can acknowledge his inability to justify rank-ordering and resort to random selection from within either the entire group that achieves a properly determined passing score, or some segment of the passing group shown to be appropriate." Guardians Association of New York City Police Department, Inc. v. Civil Service Commission, supra, 630 F.2d at 104; see also Vulcan Society of Westchester County, Inc. v. Fire Department of City of White Plains, supra, 505 F.Supp. at 964. By the terms of the settlement, each zone contained an average of 230 candidates whose final scores differed by no more than four points out of a possible final score of 88, excluding adjustments for seniority and veterans' credits. See note 6 supra. The size of the zones was based on a statistical computation of the likely error of measurement inherent in Exam 36-808 and was believed by the settling parties to be consistent with our discussion in Guardians, supra, 630 F.2d at 102-03. Accordingly, the adjustment was a proper means of insuring compliance with Title VII since, by creating a more valid method to assess the significance of test scores, it eliminated the central cause of the adverse impact, i.e., the rank-ordering system, while assuring appointments on the basis of merit. In fact, the rank-ordering system permissibly could have been modified to produce a result more disadvantageous to intervenors. See, e.g., Guardians Association of New York City Police Department, Inc. v. Civil Service Commission, supra, 630 F.2d at 104, 109 (employer may resort to random selection from within entire group that achieves a minimal passing score); Vulcan Society of Westchester County, Inc. v. Fire Department of City of White Plains, supra, 505 F.Supp. at 959, 964 (parties to a settlement can change a ranking exam to a general qualifying exam, i.e., everyone who obtained a passing grade would be treated equally for purposes of next step in hiring process). Thus, the creation of a tiered zone system which preserves some of the results of a discriminatory test may have the least detrimental effect on the interests of non-minority candidates who obtained high test scores. These provisions are reasonable and legal.
 
 
 59
 Further, the adjustment of the rank-ordering system does not deprive intervenors of any vested property right which they had under New York law. The New York Court of Appeals has stated that a person on an eligibility list does not possess "any mandated right to appointment or any other legally protectible interest." Cassidy v. Municipal Civil Service Commission, 37 N.Y.2d 526, 529, 375 N.Y.S.2d 300, 337 N.E.2d 752 (1975). The only relevant state right intervenors possess is the right to challenge the settlement on the grounds that the manner in which it provides for appointments is unlawful, arbitrary, and capricious or constitutes an abuse of discretion. Burke v. Sugarman, 35 N.Y.2d 39, 42, 358 N.Y.S.2d 715, 315 N.E.2d 772 (1974); Adelman v. Bahou, 85 A.D.2d 582, 583, 446 N.Y.S.2d 500, 502-03 (3d Dep't 1981). This right intervenors exercised in the district court.
 
 
 60
 3. Race-Conscious Promotional Appointments.
 
 
 61
 The race-conscious appointment procedures envisaged by the settlement are not unreasonable or illegal. Recognizing that full compliance with Title VII cannot be realized until all the discriminatory effects of a challenged employment practice are erased--in this case until the adverse impact resulting from the disproportionate number of non-minority appointments already made is remedied--we have held that interim race-conscious selection procedures that do not have a disparate impact on any group protected by Title VII are appropriate to bring a defendant into compliance with Title VII. Berkman v. City of New York, supra, 705 F.2d at 595-96; Association Against Discrimination in Employment, Inc. v. City of Bridgeport, 647 F.2d 256, 278 (2d Cir.1981), cert. denied, 455 U.S. 988, 102 S.Ct. 1611, 71 L.Ed.2d 847 (1982); Guardians Association of New York City Police Department, Inc. v. Civil Service Commission, supra, 630 F.2d at 108-09; see also Regents of University of California v. Bakke, supra, 438 U.S. at 362, 98 S.Ct. at 2784 (Brennan, J., concurring in part and dissenting in part). Interim race-conscious selection procedures do not have a disparate impact on any protected group when (1) they mandate the appointment of members of the plaintiff-class who are victims of the defendant's discrimination, and (2) they calculate the number of victims to be appointed--in relation to the total number of interim appointees--by reference to the percentage of the victims within the total applicant pool. Berkman v. City of New York, supra, at 595-96; Guardians Association of New York City Police Department, Inc. v. Civil Service Commission, supra, 630 F.2d at 109, 113. Because such interim selection procedures do not go beyond the simple elimination of the challenged practice's disparate impact, they are not unlawful quotas and are justified whenever a Title VII violation has occurred. Berkman v. City of New York, supra, 705 F.2d at 596; Association Against Discrimination in Employment, Inc. v. City of Bridgeport, supra, 647 F.2d at 278.
 
 
 62
 The agreement's race-conscious promotional procedures are similar to the lawful remedies described above. They are interim in nature since they will end after corrective measures are implemented and will then be followed by a valid selection procedure. See Guardians Association of New York City Police Department, Inc. v. Civil Service Commission, supra, 630 F.2d at 110. Moreover, they do not have a disparate impact on any protected group. The agreement provides, subject to certain noted exceptions, that future promotions will be offered first to minority candidates until the ratio of minority appointments equals 21%, a percentage approximately equal to the percentage of minority candidates on the eligibility list. Because the appointment of only 32 minority candidates is required to reach the 21% goal, see note 9 supra, the non-minorities on the list will not be unduly barred from promotion. The burden on non-minority candidates is further lessened by the fact that, regardless of the 21% goal, no minority candidate in a lower zone will receive an appointment until all candidates in the highest zone have been offered appointments. After the 21% goal is reached, minority candidates will receive appointments in a ratio of 1 to 4, reflecting the percentage of minorities on the eligibility list. Accordingly, because for a period only members of the plaintiff class will be offered appointments, and because the ratio of minority appointments will not exceed the minority representation of the total candidates pool, the agreement's race-conscious remedies are substantially related to and do not go beyond the goal of eliminating Exam 36-808's adverse impact.
 
 
 63
 4. The Duration of the Eligibility List.
 
 
 64
 We turn finally to the contention presented by amici curiae that the portion of the settlement which sets no discernible limit on the life of Exam 36-808's eligibility list unnecessarily trammels the interests of all DOCS employees, regardless of race, not on the current eligibility list but eligible to take the next examination for promotion to Correction Lieutenant. Specifically, the agreement calls for the list to continue "until every eligible on the 36-808 List has been offered an appointment and has been afforded a reasonable opportunity to either accept or decline." Settlement Agreement art. VI(5)(c). Judge Griesa, noting that "[n]one of the parties has offered any evidence as to what length of time will be involved in this," 552 F.Supp. at 670, did not reach any conclusion as to the probable life of the list.[20] On appeal, all the parties have offered speculative and often contradictory estimates of the anticipated life of the list, with 3 or 4 years at the low end of the range and 16 years at the high end.
 
 
 65
 The argument of those employees represented by amici is grounded on New York Civil Service Law § 56, which limits the duration of an eligibility list to four years. See N.Y.Civ.Serv.Law § 56 (McKinney 1983). New York's purpose in placing a cap on the duration of eligibility lists is to insure that all appointments to the classified civil service be based on merit and fitness. See N.Y. Const. art. V, § 6. The New York Court of Appeals has stated: "As time passes, [the eligibility list's] value as a test of merit and fitness diminishes. Others may, then, be better prepared and more fit to fill a position than those who are upon the list." Hurley v. Board of Education, 270 N.Y. 275, 280, 200 N.E. 818 (1936). Although the employees represented by amici are not currently on any eligibility list, they may compete for promotion when they achieve the requisite qualification. See Edgerton v. New York State Civil Service Commission, 84 A.D.2d 881, 444 N.Y.S.2d 731 (3d Dep't 1981).[21] Accordingly, they contend that their career interests in seeking a promotion will be unnecessarily trammeled if the eligibility list is in effect more than four years. Cf. Vulcan Society of New York City Fire Department, Inc. v. City of New York, supra, 96 F.R.D. at 631.
 
 
 66
 While courts must be sensitive to the interests of all affected third parties before approving Title VII settlements, United Steelworkers of America v. Weber, supra, 443 U.S. at 208, 99 S.Ct. at 2729, we see no reason to disturb Judge Griesa's approval on this point since there is now no basis for determining whether it will take more than four years for the current eligibility list to be exhausted. However, since we treat court ordered stipulations implicating the operations of state agencies as though they are injunctions issuing from the district court, see Pena v. New York State Division for Youth, 708 F.2d 877, 880 (2d Cir.1983); see also Carson v. American Brands, Inc., supra, 450 U.S. at 89, 101 S.Ct. at 999 (Title VII class settlements are to be treated as injunctions for purposes of appeal); Plummer v. Chemical Bank, supra, 668 F.2d at 659 (same), employees represented by amici may, after a reasonable time and in light of subsequent developments, move for modification of the settlement agreement in the district court. See United States v. Swift & Co., 286 U.S. 106, 114-15, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932); New York State Association for Retarded Children, Inc. v. Carey, 706 F.2d 956, 967 (2d Cir.1983). Because New York law allows the state to extend eligibility lists to a maximum of 4 years, Roske v. Keyes, 46 A.D.2d 366, 363 N.Y.S.2d 21 (2d Dep't 1974); N.Y.Civ.Serv.Law § 56 (McKinney 1983), and because the statutory period does not begin to run until a challenged list is approved by the court, Mena v. D'Ambrose, 44 N.Y.2d 428, 406 N.Y.S.2d 22, 377 N.E.2d 466 (1978), a reasonable time for the consideration of any modification application will only commence four years from the date of the district court's order.
 
 
 67
 Affirmed.
 
 
 
 [1]
 This is the second class action filed by Edward Kirkland and other minority correctional officers challenging as racially discriminatory the promotional selection procedures employed by DOCS. The first lawsuit, Kirkland v. New York State Department of Correctional Services, 374 F.Supp. 1361 (S.D.N.Y.1974), aff'd in part and rev'd in part, 520 F.2d 420 (2d Cir.1975), cert. denied, 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976), on remand, 482 F.Supp. 1179 (S.D.N.Y.), aff'd, 628 F.2d 796 (2d Cir.1980), cert. denied, 450 U.S. 980, 101 S.Ct. 1515, 67 L.Ed.2d 815 (1981) ("Kirkland Sergeants "), involved a successful challenge to the selection procedures used to promote correctional officers to the rank of Correction Sergeant
 
 
 [2]
 A candidate's adjusted score was determined by adding 31 points to the number of items answered correctly. See 4 N.Y.C.R.R. § 67.1(h). Seniority credits were added on the basis of 1.0 point for each five years of service. See id. § 67.2. Veterans were entitled to have 2.5 points, or 5.0 points if they were disabled, added to their scores, but this credit could be claimed only once in an officer's career. N.Y.Civ.Serv.Law § 85 (McKinney 1983)
 
 
 [3]
 The racial/ethnic breakdown of the eligibility list is as follows:
 Position Percent Number Number
Rank Nos. Minority Minority Non-Minority
 1-107 5.6% 6 101
 108-229 9.8% 12 110
 230-298 16.0% 11 58
 299-416 19.5% 23 95
 417-525 29.4% 32 77
 526-619 33.0% 31 63
 620-672 47.2% 26 28
 
 
 [4]
 The raw scores showed the following racial/ethnic breakdown:
 Score Percent Number Number
Range Minority Minority Non-Minority
50-54 7.9% 7 82
48-49 10.1% 12 107
45-47 20.8% 42 160
43-44 26.0% 27 77
39-42 33.8% 53 104
 
 
 [5]
 In their complaint, plaintiffs had also alleged that because appointments made from Exam 36-808's eligibility list determined who would be eligible to sit for the examination for promotion to Correction Captain, that examination was necessarily tainted by unlawful discrimination. The Correction Captain's examination was administered on January 30, 1982, but as of August 20, 1982, the date on which the settlement agreement was submitted to Judge Griesa, no eligibility list resulting from that test had yet been certified
 
 
 [6]
 The breakdown of the zones is detailed in the following table:
 Score Rank Number of
Zone Range Range Eligibles
 1 82.5 k 1-247 233
 2 78.0-82.0 248-525 286
 3 73.0-77.5 526-672 153
 
 
 [7]
 There are circumstances, such as when a candidate declines to accept an appointment at a particular facility, which result in appointments being made other than in strict rank-order
 
 
 [8]
 Although the basic features are contained in the settlement agreement, further details were provided by counsel at the hearing on September 29, 1982 and are contained in the minutes
 
 
 [9]
 Judge Griesa noted that since 225 appointments had been made as of September 29, 1982, of which 21 were minority appointments, the number of minority appointments needed to reach the 21% ratio is small: "If 32 minority appointments are made, the total appointments would be 257 of which 53 (or 21%) would be minority." 552 F.Supp. at 671
 
 
 [10]
 Our November 16, 1982 order granting the stay incorporated a provision of the appellees' proposed order, contained in their opposition papers, which provided:
 [T]hat if provisional appointments are made, that they be made in accordance with the terms of the settlement, that if the settlement agreement is upheld, minority officers be given retroactive seniority credits.
 On March 4, 1983, we granted the request of the parties, including the intervenors, to modify the stay to read as follows:
 [I]f the settlement agreement is upheld, all provisional Lieutenants appointed pursuant to the stay granted by this Court, minority and non-minority, shall be given permanent status in the title of Correction Lieutenant as of the date of their provisional appointment pursuant to the stay for all purposes, including probation.
 
 
 [11]
 The plurality opinion in City of Miami concluded as follows:
 A party potentially prejudiced by a decree has a right to a judicial determination of the merits of its objection. The party is prejudiced if the decree would alter its contractual rights and depart from the governmental neutrality to racial and sexual differences that is the fundament of the fourteenth amendment in order to redress past discrimination.
 664 F.2d at 447 (emphasis supplied).
 
 
 [12]
 Even if the collective bargaining agreement's provisions gave intervenors a legal right in the existing promotional procedures, such a right would not allow intervenors to veto the settlement unless it also was shown that New York law permitted the authority of the CSC to be circumscribed by private agreement. See United States v. City of Miami, supra, 664 F.2d at 447
 
 
 [13]
 The nature and effect of intervenors' interest would also be important to a timeliness analysis, since the prejudice that intervenors would suffer from a limitation of intervention is an element to be considered in determining whether an application was timely under the circumstances. See, e.g., Garrity v. Gallen, 697 F.2d 452, 455 (1st Cir.1983); Stallworth v. Monsanto, 558 F.2d 257, 264-66 (5th Cir.1977); see also NAACP v. New York, 413 U.S. 345, 364, 93 S.Ct. 2591, 2602, 37 L.Ed.2d 648 (1973); United States Postal Service v. Brennan, 579 F.2d 188, 191 (2d Cir.1978)
 
 
 [14]
 Specifically, Title VII settlements are afforded a presumption of validity because they "may produce more favorable results for protected groups than would more sweeping judicial orders that could engender opposition and resistance," Vulcan Society of Westchester County, Inc. v. Fire Department of City of White Plains, 505 F.Supp. 955, 961 (S.D.N.Y.1981); see also Vulcan Society of New York City Fire Department, Inc. v. City of New York, 96 F.R.D. 626, 629 (S.D.N.Y.1983), and because they also reduce the cost of litigation, promote judicial economy, and vindicate an important societal interest by promoting equal opportunity. Stotts I, supra, 679 F.2d at 555
 
 
 [15]
 Both the Sixth and Eighth Circuits believe that a statistical imbalance falling short of a prima facie case is sufficient to constitute a proper basis for settlement. Stotts I, supra, 679 F.2d at 555 n. 10 (6th Cir.); Setser v. Novack Investment Co., supra, 657 F.2d at 968 (8th Cir.)
 
 
 [16]
 Although the settlement agreement contains disclaimers of any admission of unlawful discrimination, Settlement Agreement arts. I(5) & (12), the defendants do not dispute the facts showing an adverse impact. Because such disclaimers are used in many compromises of this nature to protect defendants from making themselves vulnerable to large backpay awards, see United States v. City of Alexandria, supra, 614 F.2d at 1365 n. 15, we construe the disclaimers to be admissions that there is a statistical disparity together with a reservation of the right to explain it in the future. Id.; see also Stotts I, supra, 679 F.2d at 553 n. 10
 
 
 [17]
 In Guardians Association of New York City Police Department, Inc. v. Civil Service Commission, supra, 630 F.2d at 86 n. 4, we defined the concept of standard deviation as follows:
 The standard deviation for a particular set of data provides a measure of how much the particular results of that data differ from the expected results. In essence, the standard deviation is a measure of the average variance of the sample, that is, the amount by which each item differs from the mean. The number of standard deviations by which the actual results differ from the expected results can be compared to the normal distribution curve, yielding the likelihood that this difference would have been the result of chance. The likelihood that the actual results will fall more than one standard deviation beyond the expected results is about 32%. For more than two standard deviations, it is about 4.6% and for more than three standard deviations, it is about .03%.
 
 
 [18]
 Because state law must yield to federal law in Title VII cases, see Guardians Association of New York City Police Department, Inc. v. Civil Service Commission, supra, 630 F.2d at 105; 42 U.S.C. § 2000e-7 (1976), we need not consider whether the settlement agreement violates state law
 
 
 [19]
 We also find no merit in intervenors' oblique argument that the adjustment of the eligibility list into zones by itself amounts to an unlawful quota. Because the mere creation of zones in no way requires that a minimum number of appointments be given to minority candidates, it cannot be said that any race-conscious preference is established. Kirkland Sergeants, 628 F.2d 796, 798 (2d Cir.1980), cert. denied, 450 U.S. 980, 101 S.Ct. 1515, 67 L.Ed.2d 815 (1981)
 
 
 [20]
 The issue of the eligibility list's duration was not argued in the hearings before Judge Griesa as no one representing the rights of employees not on the list participated in the hearings
 
 
 [21]
 Edgerton v. New York State Civil Service Commission, 84 A.D.2d 881, 444 N.Y.S.2d 731 (3d Dep't 1981), was a state Article 78 application brought by DOCS Correction Sergeants, some of whom are intervenors in this action, which successfully compelled CSC to administer Exam 36-808 on October 3, 1981